**UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS**

No. 04-0233

BENNY R. ROPER, APPELLANT,

V.

R. JAMES NICHOLSON,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal From the Board of Veterans' Appeals

(Argued  January 11, 2006                    Decided        July 13, 2006  )

*Kenneth M. Carpenter*, of Topeka, Kansas, for the appellant.

*Thomas J. Kniffen*, with whom *Tim S. McClain*, General Counsel; *R. Randall Campbell*, Assistant General Counsel; *Edward V. Cassidy, Jr.*, Deputy Assistant General Counsel; and *Cristine D. Senseman*, Appellate Attorney, were on the brief, all of Washington, D.C., for the appellee.

Before MOORMAN, DAVIS, and SCHOELEN, *Judges*.

DAVIS, *Judge*: Benny R. Roper appeals from a December 5, 2003, decision of the Board of Veterans' Appeals (Board) that (1) denied his claim for secondary service connection for both his right-knee and left-leg disabilities and (2) affirmed the determination of the Columbia, South Carolina, regional office (RO) that awarded an 80% combined disability rating pursuant to 38 C.F.R. § 4.25 (2003) for his service-connected hearing loss and service-connected depression secondary to his hearing loss.  Record (R.) at 1-18.  On appeal, the Court must resolve the following two questions: (1) Whether the regulatory provision governing secondary service connection (38 C.F.R. § 3.310 (2005)), which provides in relevant part that a secondarily service-connected condition "shall be considered a part of the original condition," precludes VA from rating primary- and secondary-service-connection claims separately and then combining such conditions pursuant to the applicable percentage tables in 38 C.F.R. § 4.25; and (2) whether the record on appeal presents the Court sufficient evidence to reverse, rather than remand, the Board's denial of secondary service connection

for Mr. Roper's right-knee and left-leg disabilities. For the reasons provided below, the Court holds that the answers to both questions presented are no, and in so holding, will affirm the Board's determination regarding Mr. Roper's 80% combined disability rating award and vacate and remand the Board's decision denying his secondary-service-connection claims for a readjudicated decision.

## I. BACKGROUND

Mr. Roper served in the U.S. Army from October 1967 to December 1970. R. at 28. In November 1970, the RO granted his service-connection claim for bilateral hearing loss with recurrent tinnitus. R. at 53, 93. His condition was the result of acoustic trauma from friendly gunshot fire while Mr. Roper served in Korea. *Id*. Despite a lack of intermediate documentation in the record, it is undisputed that Mr. Roper's hearing had become significantly worse by 1992.[1] By 1992, he was required to wear hearing aids in both ears, and private medical records indicate that his hearing loss was "communicatively significant" and was "expected to interfere with daily communication without the benefit of all facial and auditory cues." R. at 139, 142. As a consequence of his service-connected hearing loss, Mr. Roper also experienced depression for which the RO awarded him secondary service connection in April 1999. R. at 458-60. At the time of the Board's December 2003 decision, Mr. Roper was entitled to a 50% disability rating for his service-connected hearing loss as well as a 50% disability rating for his secondarily service-connected depression. R. at 3. In April 1999, the RO combined these disability ratings in accordance with the table set forth in § 4.25, and awarded Mr. Roper an 80% combined disability rating, and the Board affirmed Mr. Roper's combined disability rating in its decision here on appeal. R. at 3, 16-17, 458-60.

In March 1992, Mr. Roper also filed with the RO secondary-service-connection claims for his right-knee and left-leg disabilities, asserting that these conditions were the result of his inability to hear and react to warning signs of oncoming accidents. R. at 106-07. As referred to in his statement in support of his claim, Mr. Roper injured his right knee during a work-related accident

---

[1] *Compare* R. at 54 (providing an October 1970 diagnosis of "hearing loss, bilateral, sensorineural, moderate, with reduced discrimination, noise induced") *with* R. at 150 (providing a VA medical examination report diagnosis of "deafness, hearing deficient, severe, requiring hearing aid").

in January 1976. R. at 106, 113. Although that incident and a resulting right-knee injury are confirmed through medical records and workers' compensation documentation, the only documented accounts of what occurred during the accident are those of the veteran and witness statements made by two of the veteran's coworkers, Alton L. Cox, whose statement was written at the request of the veteran in March 1992, and Harold Swafford, whose statement was written at the request of the veteran in November 1996. R. at 106-07, 122, 203-20, 309.

According to these statements, while Mr. Roper was carrying several boxes down a flight of stairs to a loading dock, a truck began backing into the dock. In the opinion of these witnesses, Mr. Roper's view of the truck was obstructed by the boxes he was carrying. At least one of the witnesses recalled shouting at Mr. Roper several times to get his attention, but because of Mr. Roper's hearing loss, the witness was initially unable to get his attention. Before Mr. Roper had fully descended the stairwell to the loading dock, his coworkers' shouts of warning ultimately captured his attention. However, he reacted to his coworkers' warnings in a way that caused him to turn, slip, and fall, resulting in an injury to his right knee. According to both witnesses' accounts and Mr. Roper's own statements, the accident could have been avoided if he had been able to hear the truck or his coworkers' initial shouts of warning. In further support of his claim, Mr. Roper submitted a February 1998 private medical opinion from his treating physician, Dr. Dexter Rogers, who, after being informed of what had occurred by the veteran, opined that the veteran's right-knee disability was "a result of his inability to hear, and therefore, directly relates to his service deafness." R. at 371.

Mr. Roper's second asserted secondary-service-connection claim, a left-leg disability, arises out of a March 1991 boating accident. Similar to his right-knee disability, the injury to his left leg is confirmed by medical documentation. However, the only documented accounts of how the accident happened are those of the veteran and his friend, D.E. Revis, Jr., whose written statements in March 1992, November 1992, and November 1996 were made at the request of the veteran. R. at 106-07, 134, 144, 182-83, 196, 203-20, 311.

According to these statements, while Mr. Roper and Mr. Revis attempted to winch a boat onto the trailer, the boat began to dislodge as a result of Mr. Roper and Mr. Revis' failure to properly lock the winch. According to his statements, Mr. Roper was standing close to the handle of the winch. Mr. Revis heard the stripping sound of the gear on the winch, but Mr. Roper's hearing loss

3

prevented him from becoming aware of such signs of trouble. Mr. Revis shouted at Mr. Roper to clear the trailer, but Mr. Roper did not hear his warnings before the winch handle began beating against his left calf, causing permanent deep-vein thrombosis. According to both Mr. Roper's and Mr. Revis' statements, the left-leg condition would not have occurred if Mr. Roper had been able to hear either Mr. Revis' initial shouts of warning or the stripping sound of the gear on the winch. Additionally, in support of his claim, Mr. Roper submitted the February 1998 private medical opinion of his treating physician, Dr. Rogers, who, after being informed of what had occurred by the veteran, opined that the veteran's left-leg disability was "a result of his inability to hear, and therefore, directly relates to his service deafness." R. at 371.

The RO initially denied Mr. Roper's claims for secondary service connection for his right-knee and left-leg disabilities in a March 1992 rating decision to which Mr. Roper timely filed a Notice of Disagreement. R. at 175, 182. Significant evidentiary development ensued, leading to a September 1998 Board decision that also denied secondary service connection for these conditions. R. at 397-418. Then, on appeal to this Court, Mr. Roper joined the Secretary's motion to vacate the Board's 1998 decision and to remand the matter to the Board to conduct additional evidentiary development. R. at 421-32. After five years of such development, on December 5, 2003, the Board issued the decision here on appeal, again denying Mr. Roper's secondary-service-connection claims for his left-leg and right-knee conditions. The Board found that "the veteran has failed to submit, and the Board is unable to obtain (short of finding a physician who witnessed both accidents) persuasive and competent evidence linking the current right[-]knee disability and residuals of a left [-]leg injury to the service[-]connected bilateral hearing loss." R. at 16. The Board thus concluded that "[t]he weight of the credible evidence establishes that service-connected bilateral hearing loss did not cause or permanently worsen a right[-]knee disorder and residuals of a left[-]leg injury." *Id*. Additionally, the Board found no merit in the appellant's argument that his disability rating for hearing loss and his disability rating for depression should be added together, rather than combined under the table in § 4.25, noting that "[c]learly the rules for combined ratings are set forth in the regulation on combined ratings and not in the regulations on secondary service connection." R. at 17.

4

## II. DISCUSSION

### A. Combined Rating of Primary- and Secondary-Service-Connection Claims

#### 1. 38 C.F.R. § 3.310(a) and the Parties' Contentions

On appeal, Mr. Roper contends that the Board erred by concluding that he was not entitled to a 100% rating for his service-connected hearing loss and his secondary-service-connected depression. Appellant's Brief (Br.) at 15. He does not assert that the Board miscalculated his rating in accordance with the table set forth in § 4.25. He also does not assert any argument regarding the validity of that regulation or its rule that each service-connected disability arising from a single disease entity is to be rated separately, and the ratings combined, unless otherwise provided by the Secretary. *See Esteban v. Brown*, 6 Vet.App. 259, 261 (1994); *see also* 38 C.F.R. § 4.25 (2005) (providing that this rule is subject to the exceptions set forth in that "schedule"). Rather, his only contentions on this issue regard whether § 4.25 was triggered in the first place.

As noted above, Mr. Roper is service connected both on a primary basis for his hearing loss and also on a secondary basis for his depression, which VA determined was the result of his hearing loss. With regard to secondary-service-connection claims, VA has promulgated regulation § 3.310(a), which provides:

> Except as provided in § 3.300(c), disability which is proximately due to or the result of a service-connected disease or injury shall be service connected. *When service connection is thus established for a secondary condition, the secondary condition shall be considered a part of the original condition.*

38 C.F.R. § 3.310(a) (emphasis added). On appeal, Mr. Roper asserts that the emphasized language of § 3.310(a) exclusively governs the rating of secondarily service-connected conditions. Appellant's Br. at 19. Pursuant to the plain meaning of this language, he contends that VA must "unify" or add the disability rating of his secondarily service-connected condition to the disability rating of the underlying service-connected condition rather than combine them under the table in § 4.25. *Id.* at 17-18. He further asserts that allowing VA to apply the combined rating tables in § 4.25 contravenes the plain meaning of § 3.310(a) and further renders such language meaningless. *Id.* at 18. In response, the Secretary contends that Mr. Roper's regulatory argument "is without legal foundation, and is a concept found nowhere in the statutory scheme for veterans law." Secretary's Br. at 11.

5

We agree with the Secretary that the plain language of § 3.310(a) does not preclude VA from combining his disability rating for Mr. Roper's secondarily service-connected condition with his disability rating for the underlying condition using the table in § 4.25. In fact, we conclude that when properly read within the overall statutory and regulatory VA disability benefits scheme, the plain meaning of the applicable language, "the second condition shall be considered a part of the original condition," actually requires this result. Therefore, for the reasons provided below we will affirm the Board's determinations with regard to this matter.

### 2. 38 C.F.R. § 3.310(a) in the Statutory and Regulatory Scheme

### a. Applicable Law

In order to determine the plain meaning of the clause "the second condition shall be considered a part of the original condition," we will first consider 38 C.F.R. § 3.310(a)'s place in the VA adjudication scheme. *See* 2A N. SINGER, SUTHERLAND ON STATUTORY CONSTRUCTION, § 46:05 (6th ed. 2000) [hereinafter SUTHERLAND] ("[T]he court will not only consider the particular statute [or regulation] in question, but also the entire legislative [and regulatory] scheme of which it is a part."); *see also King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (holding that when interpreting a statute [or regulation], the court is required to look at the context and provisions of law as a whole); *Imazio Nursery, Inc. v. Dania Greenhouse*, 69 F.3d 1560, 1564 (Fed. Cir. 1995) (holding that all parts of a statute must be construed together without according undue importance to a single or isolated portion). Moreover, the VA statutory and regulatory scheme "should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error." SUTHERLAND, § 46:06; *see also Splane v. West*, 216 F.3d 1058, 1068-69 (Fed. Cir. 2000).

### b. Relevant Chain of Analysis

Currently codified at 38 U.S.C. §§ 1110 (war time) and 1131 (peace time), the basic-entitlement statutes for disability compensation benefits provide:

> For disability resulting from personal injury suffered or disease contracted in line of duty, or for aggravation of a preexisting injury suffered or disease contracted in line of duty, in the active military, naval, or air service, during a period of war [or during other than a period of war], the United States will pay to any veteran thus disabled

6

and who was discharged or released under conditions other than dishonorable from the period of service in which said injury or disease was incurred, or preexisting injury or disease was aggravated, compensation as provided in this subchapter, but no compensation shall be paid if the disability is a result of the veteran's own willful misconduct or abuse of alcohol or drugs.

38 U.S.C. §§ 1110, 1131. Each claim for disability compensation benefits consists of five elements: (1) Veteran status; (2) existence of a disability; (3) a connection between the veteran's service and the disability; (4) degree of disability; and (5) effective date of the disability. *Collaro v. West*, 136 F.3d 1304, 1308 (Fed. Cir. 1998). Only two of these elements are relevant to the instant matter, a connection between the veteran's service and the disability (service connection) and the degree of disability (disability rating).

Service connection can be established in several different ways. For example, service connection may be granted on a direct basis. *See* 38 C.F.R. §§ 3.303, 3.304, 3.305 (2005). Direct service connection involves proving that a particular injury or disease was incurred in or caused by military service. Service connection may also be established by the aggravation of a preservice disability. *See* 38 C.F.R. § 3.306 (2005). Under certain circumstances, service connection may also be granted on a presumptive basis. *See* 38 C.F.R. §§ 3.307, 3.308, 3.309, 3.311, 3.316, 3.317 (2005). In claims involving presumptive service connection, rather than establishing that a particular injury or disease was incurred in or caused by military service, the claimant instead only needs to establish certain facts necessary to invoke a presumption that an injury or disease was incurred in or caused by service. Also, and most relevant in this case, service connection may be established on a secondary basis for disabilities which are "proximately due to or the result of a service-connected disease or injury." 38 C.F.R. § 3.310(a).

Once service connection is established, VA proceeds to the next element of a disability compensation claim, determining a proper disability rating. VA is given authority, in accordance with 38 U.S.C. § 1155, to "adopt and apply a schedule of ratings of reductions in earning capacity from specific injuries or combination of injuries." Pursuant to this authority, VA promulgated various regulations establishing specific diagnostic codes for various conditions and also establishing the rules and procedures by which VA must rate a disability. *See* 38 C.F.R. pt. 4. Pertinent to the matter on appeal, one regulatory rule established pursuant to section 1155's statutory authority is that, generally, each service-connected disability arising from a single disease entity is to be rated

separately, and the ratings combined in accordance with the combined ratings table contained in § 4.25, unless otherwise provided by the Secretary. *See Esteban*, 6 Vet.App. at 261; *see also* 38 U.S.C. § 1157 (providing the Secretary authority to "provide for combined ratings"). The purpose of the combined ratings is precisely to assess the efficiency of the individual as affected by several disabling conditions. *See* 38 C.F.R. § 4.25 ("Table I, Combined Ratings Table, results from the consideration of the efficiency of the individual as affected first by the most disabling condition, then by the less disabling condition").

c. 38 C.F.R. § 3.310(a)'s Place in the Statutory and Regulatory Scheme

Having set up the relevant chain of analysis, we must now determine at what point or points § 3.310(a) comes into play. We begin by noting that § 3.310(a) cites 38 U.S.C. § 501 (VA's general rulemaking authority) and 38 U.S.C. §§ 1110-1131 (statutory provisions governing basic entitlement) as its statutory authority. Initially, we find more importance in the fact that statutory provisions governing basic entitlement rather than rating determinations (38 U.S.C. § 1155) are cited as authority for § 3.310(a) because only after a disability or disease is service connected does VA award a disability rating. However, in disability compensation claims, without the award of service connection, the conditions have no way to reach the point of a disability rating.

As noted above, in order for VA disability benefits to be granted, the disability claim must be based on a theory of entitlement that relates that condition to the veteran's service. With regard to direct service-connection claims the evidence must sufficiently establish a nexus between the claimed in-service injury or disease and the current disability. *See Caluza v. Brown*, 7 Vet.App. 498, 506 (1995); *see also Hickson v. West*, 12 Vet.App. 247, 252 (1999). This nexus requirement is clearly ascertainable from the statutory basic entitlement language.

However, the basic entitlement provisions do not set forth an answer as to whether the nexus requirement can be stretched to encompass disability benefits for conditions that result not directly from service, but as a result of the service-connected condition. It cannot be disputed, therefore, that the intended purpose behind creating a secondary-service-connection regulation was to establish a pathway for such claims to receive entitlement to disability benefits. Only through satisfying the criteria necessary for secondary service connection would those claims proceed to the disability rating stage.

Excluding for the moment arguments relating to the plain meaning of the language in dispute, we can find no evidence, persuasive or otherwise, that § 3.310(a) was intended to govern any element of disability benefit decisionmaking other than the determination of service connection. With regard to the specific issue of disability ratings, we note that § 3.310(a) fails to cite section 1155 as its authority or even mention the word "rating." Such absences cast a large shadow of doubt over the reasonableness of Mr. Roper's contention that any part of § 3.310(a) was intended to govern the rating of secondarily service-connected conditions.

*3. Plain Meaning Analysis of "Will Be Considered a Part of the Original Condition"*

Although we find that, based on our analysis of § 3.310(a) in the statutory and regulatory scheme, VA intended § 3.310(a) to govern only entitlement of secondary-service-connection claims and not their disability ratings, our analysis cannot stop there. We must decide whether the plain meaning of the words "will be considered a part of the original condition" precludes VA from looking outside the regulation for disability rating purposes. Determining a regulation's plain meaning "requires examining the specific language at issue and the overall structure of the statute [and applicable regulations]." *Gardner v. Derwinski*, 1 Vet.App. 584, 586 (1991) [hereinafter *Gardner I*], *aff'd sub nom. Gardner v. Brown*, 5 F.3d 1456 (Fed. Cir. 1993), *aff'd Brown v. Gardner*, 513 U.S. 115, 118 (1994); *see also Splane*, 216 F.3d at 1068-69 ("Canons of construction . . . require us to give effect to the clear language of a [regulation] and avoid rendering any portions meaningless or superfluous."). Where the plain meaning of a regulation is discernable, that "plain meaning must be given effect unless a 'literal application of [the regulation] will produce a result demonstrably at odds with the intention of its drafters.'" *Gardner I*, 1 Vet.App. at 587 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)).

Here, we find that the regulatory history behind § 3.310(a) provides clear guidance as to the plain meaning of the words "will be considered a part of the original condition." These words first appeared in 1933 with the promulgation of Veterans Regulation (VR) Number (No.) 3(a). That regulation provided:

> Disability which is proximately due to or the result of a properly service[-]connected disease or injury is pensionable, unless such disability is shown to be the result of a non-service[-]connected intervening cause. When service connection is thus established for a secondary condition, *the secondary condition will be considered a*

9

*part of the original condition for all purposes, i.e., for determinations regarding rights on account of combat, etc.*

VR No. 3(a) (emphasis added). Three years later, VA shortened the applicable language in VR No. 3(a) to "the secondary condition will be considered a part of the original condition for all purposes." Regulation & Procedural Rule 1101 (Jan. 25, 1936). That language remained in effect until 1961 when VA issued the current version of 38 C.F.R. § 3.310(a), shortening the regulation by removing "for all purposes." 38 C.F.R. § 3.310(a) (1961).

Based on the regulatory history, we find that the plain meaning of the regulation is and has always been to require VA to afford secondarily service-connected conditions the same treatment (no more or less favorable treatment) as the underlying service-connected conditions for all determinations. We are not persuaded that the slight and inconsequential changes made to the regulation's language over the years were intended to depart from this meaning. If VA had intended to change the regulation substantially to govern disability ratings of secondary-service-connection claims exclusively, VA would have made its intent more ascertainable in drafting the regulation's language. Pursuant to the plain meaning of these words, we must reject Mr. Roper's arguments. It would indeed be an anomalous and unharmonious result to read these words to require the same treatment for the underlying and the secondarily service-connected conditions and then conclude that VA intended this same language to treat secondarily service-connected conditions differently with regard to disability ratings. Moreover, our plain-language analysis, coupled with our conclusion that VA only intended § 3.310(a) to govern service connection and not disability ratings of secondary-service-connection conditions, leaves no room for doubt that the meaning of "will be considered a part of the original condition" does not preclude VA from rating a secondarily service-connected condition separately from the underlying condition and then combining the ratings under § 4.25. Accordingly, we affirm the Board's determinations with regard to this issue.

B.  Mr. Roper's Secondary-Service-Connection Claims

*1.  Applicable Law*

Secondary service connection may be granted for any disability that is proximately due to or the result of a service-connected disease or injury. 38 C.F.R. § 3.310(a); *see Allen v. Brown*, 7 Vet.App. 439, 448 (1995) (allowing secondary service connection for aggravation of non-service-connected condition by service-connected disability). The Board's decision regarding the finding

of secondary service connection is a finding of fact that the Court reviews under the "clearly erroneous" standard of review set forth in 38 U.S.C. § 7261(a)(4). *See Harder v. Brown*, 5 Vet.App. 183, 187 (1993). Under the "clearly erroneous" standard of review, the Court must set aside a finding of material fact when, after reviewing the record as a whole, it is "left with the definite and firm conviction that a mistake has been committed." *Gilbert v. Derwinski*, 1 Vet.App. 49, 52 (1991) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). When applying this standard, "'[i]f the [Board's] account of the evidence is plausible in light of the record viewed in its entirety, the [Court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" *Id.* (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985)).

Furthermore, the Board is required to consider all evidence of record and to consider, and discuss in its decision, all "potentially applicable" provisions of law and regulation. *Schafrath v. Derwinski*, 1 Vet.App. 589, 593 (1991); *see* 38 U.S.C. § 7104(a); *Charles v. Principi*, 16 Vet.App. 370, 373 (2002); *Weaver v. Principi*, 14 Vet.App. 301, 302 (2001) (per curiam order); *Sanden v. Derwinski*, 2 Vet.App. 97, 100 (1992). The Board is also required to include in its decision a written statement of the reasons or bases for its findings and conclusions on all material issues of fact and law presented on the record; that statement must be adequate to enable an appellant to understand the precise basis for the Board's decision, as well as to facilitate informed review in this Court. *See* 38 U.S.C. § 7104(d)(1); *Allday v. Brown*, 7 Vet.App. 517, 527 (1995); *Gilbert,* 1 Vet.App. at 56-57. To comply with this requirement, the Board must analyze the credibility and probative value of the evidence, account for the evidence that it finds persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the claimant. *See Caluza, supra*; *Gabrielson v. Brown*, 7 Vet.App. 36, 39-40 (1994); *Gilbert, supra*.

### 2. Proper Remedy

Here, the Secretary concedes, and the Court agrees, that the Board erred with regard to its statement of reasons or bases for its denial of both of Mr. Roper's secondary-service-connection claims. Therefore, the sole issue remaining before the Court is whether reversal or remand is the appropriate remedy in this case. We begin our analysis by first rejecting Mr. Roper's argument that reversal is required on the grounds that the Secretary failed to address it in his brief and has therefore

11

waived the issue. Although the Secretary's brief is somewhat indirect, we read it as asserting that, although remand is appropriate here, reversal is not. *See* Secretary's Br. at 7-10. Accordingly, we will address the issue of whether reversal is appropriate here or whether we should remand the matter to the Board for readjudication. *See Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982) (stating that "where findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue"); *see also Harder,* 5 Vet.App. at 189 (reversing the Board's denial of a secondary-service-connection claim on the grounds that "there can be one permissible view of the evidence, and thus, the finding is clearly erroneous").

As to Mr. Roper's right-knee disability, the Board committed clear legal error in several respects with regard to its statement of reasons or bases. First, as conceded by the Secretary, the Board failed to apply the applicable laws relating to secondary service connection. In particular, despite noting that "his right[-]knee injury may have been caused by any number of factors besides impaired hearing," the Board failed to make a finding as to whether there was a causal connection between his service-connected hearing loss and the 1976 work-related accident leading to his right-knee disability. *See* 38 C.F.R. § 3.310(a) (providing that service connection shall be granted for secondary conditions that are either proximately due to or the result of a service-connected condition); *Jackson (Deborah) v. Nicholson*, 433 F.3d 822, 825 (Fed. Cir. 2005) (noting that the words "as the result of" in 38 U.S.C. § 1151 "only implies a causal connection").

Second, the Board questioned the relevance of Dr. Rogers' February 1998 opinion on the grounds that Dr. Rogers' opinion was not based on a personal account of the event, and that Dr. Rogers' opinion contained factual inaccuracies, including inaccurate dates and a statement that Mr. Roper was actually struck by the truck. R. at 14-15. Moreover, the Board concluded that it had no obligation to obtain a VA medical opinion in this matter because no physician actually reported witnessing the accidents, and "[a] doctor's medical opinion that hearing loss caused the accidents and injuries [here] is insufficient to resolve the question of [causation, a] fact[ual issue]." R. at 16. Although properly noting that Dr. Rogers' medical opinion (or any medical opinion from a doctor who did not personally witness the accident) could not be used to verify the factual event in question, the Board impermissibly dismissed the use of any medical opinion as to the issues of (1) whether it

12

was as likely as not that someone with the veteran's level of hearing loss would be unable to hear the truck or the shouts of warning and (2) whether it was as likely as not that the veteran's level of hearing loss in combination with the sudden ability to hear shouts of warning (as compared to an individual with normal hearing levels suddenly hearing shouts of warning) caused the veteran to instinctively turn with the force required to cause his right-knee disability.

Third, the Board failed to provide an adequate statement of the reasons or bases for the weight it gave to the lay statements made on behalf of the veteran. In its decision on appeal, the Board found the witnesses' statements incompetent to show causation because the statements were made several years after the event and their accuracy was diminished by the passage of time. Although it is the Board's and not the Court's place to properly weigh and evaluate the evidence in the record, the Board may not arbitrarily reject the value of a statement where there is no contrary evidence. Here, instead of properly weighing and evaluating Mr. Roper's and his coworkers' lay statements, the Board impermissibly gave this evidence no weight and instead merely speculated, without any reliance on the record, that it could logically infer from the witnesses' statements that the veteran eventually heard the warnings of his coworkers and that his right-knee injury may have been caused by any number of other factors besides impaired hearing.

Although we find clear error in the Board's statement of reasons or bases, we cannot at this time conclude, without sufficient evidence as to whether it is possible that Mr. Roper's level of hearing loss could have causally contributed to the force at which he turned and disabled his knee, that only one permissible resolution of the matter exists, namely reversal. *See Pullman-Standard, supra*. Accordingly, we remand this matter to the Board for further proceedings consistent with this decision.

As to Mr. Roper's left-leg condition, for similar reasons we find that remand, and not reversal, is the appropriate remedy. First, the Board again failed to properly address and apply the requirements of § 3.310(a), including making a specific determination as to whether there was a causal connection between his service-connected hearing loss and the 1991 boating accident. *See* 38 C.F.R. § 3.310(a); *Jackson (Deborah), supra.* Moreover, based on the record and the Board's failure to cite to an external source of boating safety standards, the Board appears to exercise expertise outside the discretion of its authority.

13

In *Espiritu v. Derwinski*, 2 Vet.App. 492 (1992), this Court stated that generally "'scientific, technical, or other specialized knowledge,' must be provided by a 'witness qualified as an expert by knowledge, skill, experience, training, or education.'" *Espiritu*, 2 Vet.App at 495 (citing the Federal Rules of Evidence). As to the issue of causation, the Board noted that "[t]here are more likely causes for the left[-]leg injury, other than hearing loss." R. at 14. The Board concluded that the most obvious cause of the left-leg injury was "the veteran's failure to follow basic safety rules when loading a boat on a trailer, including never placing a body part in the area of the winch handle when there is a load on the winch." *Id*. However, the Secretary conceded at oral argument that the Board relied on boating safety standards that were not contained in the record before it. While this Court does not hold that the Board cannot rely on its own experiences or skill, without citation to some external source regarding boating safety standards the Board's analysis is solely supported by anecdotal information which is insufficient to support its conclusion.

Second, despite summarily dismissing Dr. Rogers' opinion and the need for a medical opinion in this case, the Board failed to consider and explain why it was unnecessary to have medical evidence as to whether it was as likely as not that someone with Mr. Roper's level of hearing loss would be unable to hear the signs of the oncoming accident or Mr. Revis' shouts of warning. Rather, the Board questioned the validity of Mr. Revis' conclusion, noting that the simultaneous gear noise, warning shouts, and injury lead to the conclusion that "even with perfect hearing, it appears that the injury could not have been avoided." R. at 14. The Board thus erred in its statement of reasons or bases by merely speculating, without support in the record and without taking into consideration the equipoise standard in section 5107(b), that the accident would have occurred whether or not Mr. Roper could have heard the shouts of warning.

Again, because there is insufficient evidence in the record for the Court to conclude that only one plausible resolution exists in this case, reversal is not the appropriate remedy here. Accordingly, we will also remand Mr. Roper's left-leg claim for further proceedings consistent with this decision. On remand, the Board decision regarding service connection must provide an adequate statement of reasons or bases, consistent with section 7104(d)(1). In particular, we remind the Board on remand of its obligation to discuss all applicable laws pertaining to secondary service connection and also its obligation to resolve any reasonable doubt in favor of the veteran. *See* 38 U.S.C. §§ 5107(b),

14

7261(b)(1). On remand, Mr. Roper will be free to submit additional evidence and argument on the remanded claims, and the Board is required to consider any such evidence and argument. *See Kay v. Principi*, 16 Vet.App. 529, 534 (2002). A remand by this Court or by the Board confers on an appellant the right to VA compliance with the terms of the remand order and imposes on the Secretary the obligation of ensuring compliance with those terms. *See Stegall v. West*, 11 Vet.App. 268, 270-71 (1998). A final decision by the Board following remand herein ordered will constitute a new decision that, if adverse, may be appealed to this Court only upon the filing of a new Notice of Appeal with the Court not later than 120 days after the date on which notice of the Board's new final decision is mailed to the appellant. *See Marsh v. West*, 11 Vet.App. 468, 472 (1998). Additionally, we remind the Board on remand that these matters have been pending before VA and this Court for more than 14 years now without a final resolution. Therefore, we fully expect the Board to proceed expeditiously in this matter in accordance with 38 U.S.C. § 7112 (expedited treatment of remanded claims).

### III. CONCLUSION

Upon consideration of the foregoing, the December 5, 2003, Board decision is AFFIRMED as to its determination regarding Mr. Roper's combined disability rating award for his hearing loss and depression; and VACATED as to its determinations regarding his secondary-service-connection claims for a right-knee and left-leg condition; and those matters are REMANDED for readjudication consistent with this opinion.

15